**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: FLAT GLASS ANTITRUST LITIGATION (II)** | **Master Docket Misc. No.: 08-180 (DWA) MDL No.: 1942** |
| **This Document Relates to: All Actions** | **CONSOLIDATED AMENDED COMPLAINT – CLASS ACTION** **JURY TRIAL DEMANDED** |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Colonial Glass Solutions, Gilkey Window Company, Inc., Girard Glass Corporation, Jackson Glass Company, Inc., Maran-Wurzell Glass & Mirror, and Thermo-Twin Industries, Inc., individually and on behalf of a class of those similarly situated, bring this action for treble damages under the antitrust laws of the United States against Defendants named in this Complaint and demand a trial by jury.

Plaintiffs, by and through undersigned counsel, allege as follows upon information and belief except as to paragraphs applicable to individual Plaintiffs, which are based upon personal knowledge:

## NATURE OF THE ACTION

1.     This is an antitrust class action charging the principal United States manufacturers of high quality float glass used for construction and architectural applications ("Construction Flat Glass") with price fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.     Plaintiffs bring this action on behalf of themselves and all entities that purchased Construction Flat Glass in the United States directly from Defendants, or their controlled subsidiaries, from at least July 1, 2002 and continuing through at least December 31, 2006 (the

"Class Period").  As a result of Defendants' anticompetitive conduct, Plaintiffs and members of the proposed Class paid Defendants higher prices for Construction Flat Glass than they would have paid absent Defendants' anticompetitive conduct.

3.       Defendants – AGC America, Inc., AGC Flat Glass North America, Inc. (collectively, "AGC"), Guardian Industries Corp. ("Guardian"), Pilkington North America, Inc., Pilkington Holdings Inc. (together, "Pilkington"), and PPG Industries, Inc. ("PPG") – are the largest manufacturers of Construction Flat Glass in the United States.

4.       During the Class Period, Defendants controlled approximately 75% of the United States market for Construction Flat Glass.  In addition, Guardian, AGC, and Pilkington (through affiliated companies) dominated the European market for Construction Flat Glass, along with the French company Saint-Gobain, similarly controlling about 75% of that market.

5.       In mid-2002, Defendants agreed to raise and fix prices of Construction Flat Glass sold in the United States.  Defendants accomplished this through a combination of collusive "energy surcharges" and price increases.  Defendants agreed to impose identical "energy surcharges," which they would present as cost-recovery vehicles and add to the price of truckloads of Construction Flat Glass they sold.  Defendants also agreed to raise prices of their Construction Flat Glass products by identical percentages.  For a period of over thirty months, pursuant to their agreement, Defendants raised energy surcharges and prices by identical amounts on numerous occasions.

6.       Defendants first introduced energy surcharges for a short period of time beginning in late 2000, prior to the Class Period, when Defendants' natural gas costs unexpectedly spiked.  These surcharges were in effect from approximately October 2000 until the end of 2001.  During this period, Defendants imposed different energy surcharges, reflecting the fact that their actual

energy costs differed.  For example, some Defendants set different surcharge levels for different regions of the country, since their energy costs varied in the different regions in which their plants were located.  By the end of 2001, with natural gas costs under control, Defendants stopped imposing the surcharges.

7.      By 2002, prices of Construction Flat Glass in the United States were falling, and Defendants were having difficulty unilaterally raising or even maintaining the prices of their products.  Defendants recognized that imposing energy surcharges could be an effective way to raise prices across the board but only if all Defendants agreed to implement the same energy surcharge program and to set their energy surcharges at identical levels.  Only through such agreement and coordination could Defendants guarantee industry-wide acceptance of energy surcharges at inflated levels.

8.      In mid-2002, when natural gas prices began to rise, Defendants saw an opportunity to increase prices and profits by imposing coordinated across-the-board price increases under the guise of energy surcharges.  In approximately June 2002, Defendants entered into an agreement to fix energy surcharges and impose them on their customers for truckloads of Construction Flat Glass.

9.      Pursuant to their agreement, Defendants falsely presented "energy surcharges" to their customers as fees necessary to recoup unexpected increases in energy costs.  Defendants knew, however, that the surcharges did not correspond to their actual energy costs.  Rather, the surcharges were a means to increase prices and profits.

10.     Defendants agreed to reintroduce energy surcharges at the same time and to adopt identical surcharge programs and a new surcharge schedule.  This new schedule set energy surcharges at higher levels than the previous schedules Defendants had used and did not account

for any regional variation.  Defendants also agreed to announce the same energy surcharges on a quarterly basis, to adjust them in lockstep, and not to deviate from the agreed-upon price schedule.

11.     In June 2002, each Defendant separately informed its customers that it was reinstituting energy surcharges linked to a new surcharge schedule.  Each Defendant set its new, identical energy surcharges to go into effect on the same day – July 1, 2002.

12.     Beginning July 1, 2002, Defendants invariably set their energy surcharges at the exact same level, quarter after quarter, for over thirty months.  Over this period, Defendants' energy surcharges steadily increased – from $200/truckload for the third quarter of 2002 to $900/truckload in the first quarter of 2005.

13.     In furtherance of their agreement, Defendants also announced identical percentage-based price increases on their Construction Flat Glass products.

14.     Defendants' price-fixing agreement met with unprecedented success in raising and stabilizing prices of Construction Flat Glass across the board.  Defendants' collusion permitted them to achieve robust and record profits, even though they were operating in a mature industry under challenging economic conditions.  Pilkington, for example, informed investors in November 2004 that it had achieved "robust profits, despite rising costs."  Pilkington's chief executive observed: "Against a background where 80 percent of our business is in markets where prices are flat or in decline and volumes are flat, I'm very pleased with our result."

15.     At the same time Defendants were fixing prices in the United States, their European counterparts (except PPG) were similarly fixing prices in Europe.  On February 22 and 23, 2005, the European Commission (the "EC" or "Commission") carried out surprise raids on the European premises of Guardian, Pilkington, AGC Flat Glass Europe (formerly known as

Glaverbel), and Saint-Gobain.  On March 2, 2005, the EC conducted a second round of raids on the premises of Guardian and the leading European trade association for flat glass manufacturers, known as GEPVP.  The EC investigation focused on Defendants' coordinated imposition of "energy surcharges" and price increases in various European countries.

16.     The EC uncovered definitive evidence of a price-fixing cartel in the European Construction Flat Glass market.  The cartel operated through face-to-face meetings in restaurants and hotels during which representatives of the European affiliates of AGC, Guardian, Pilkington, and Saint-Gobain agreed on prices and other commercial conditions for the sale of Construction Flat Glass, the timing of price-increase announcements, and minimum prices to be charged.

17.     The EC imposed the fifth largest fine for a price-fixing cartel in the history of the European Union, totaling €486.9 million.  Guardian (which is based in the United States) received the largest fine of €148 million.  The EC fined Pilkington €140 million, Saint-Gobain €133.9 million, and Asahi/AGC, which had applied for leniency and turned over evidence of the cartel's operation, €65 million.

18.     With the onset of the EC investigation, Defendants sought to give at least the appearance of price competition in the United States.  Following the EC's surprise raids in Europe, for the first time in over thirty months, Defendants diverged from each other on their surcharges in the United States.  For a period thereafter, in a striking change from prior practice, Defendants' surcharges differed, quarter after quarter, sometimes by several hundreds of dollars per truckload.

## PARTIES

### Plaintiffs

19.     Plaintiff Colonial Glass Solutions ("Colonial Glass") is a New York corporation with its principal place of business located at 35 Kent Avenue, Brooklyn, New York 11211. Colonial Glass is in the business of fabricating various glass products, including insulated windows, tempered glass, security glass, and pattern glass.  Colonial Glass purchased Construction Flat Glass directly from one or more of the Defendants during the Class Period and paid an energy surcharge imposed by Defendants on those purchases.

20.     Plaintiff Gilkey Window Company, Inc. ("Gilkey Window") is an Ohio corporation with its principal place of business located at 3625 Hauck Road, Cincinnati, Ohio 45241.  Gilkey Window is in the business of manufacturing and installing doors and windows. Gilkey Window purchased Construction Flat Glass directly from one or more of the Defendants during the Class Period and paid an energy surcharge imposed by Defendants on those purchases.

21.     Plaintiff Girard Glass Corporation is a California corporation with its principal place of business located at 2350 E. 37th Street, Los Angeles, California 90058.  Girard Glass is in the business of fabricating glass into various sizes and shapes for resale.  Girard Glass purchased Construction Flat Glass directly from one or more of the Defendants during the Class Period and paid an energy surcharge imposed by Defendants on those purchases.

22.     Plaintiff Jackson Glass Company, Inc. ("Jackson Glass") is an Alabama corporation with its principal place of business located at 1510 Forest Avenue, Jackson, Alabama 36545.  Jackson Glass is in the business of installing commercial, residential, and automobile glass.  Jackson Glass purchased Construction Flat Glass directly from one or more of the

Defendants during the Class Period and paid an energy surcharge imposed by Defendants on those purchases.

23.     Plaintiff Maran-Wurzell Glass & Mirror ("Maran-Wurzell") is a California corporation with its principal place of business formerly located at 1683 Mount Vernon Avenue, Pomona, California 91768.  From its inception in 1939 until March 2008, Maran-Wurzell was in the business of fabricating mirrors and other glass products.  Maran-Wurzell purchased Construction Flat Glass directly from one or more of the Defendants during the Class Period and paid an energy surcharge imposed by Defendants on those purchases.

24.     Plaintiff Thermo-Twin Industries, Inc. ("Thermo-Twin") is a Pennsylvania corporation with its principal place of business located at 1155 Allegheny Ave., Oakmont, Pennsylvania 15139.  Thermo-Twin is in the business of fabricating and installing windows, doors, and other glass products.  Thermo-Twin purchased Construction Flat Glass directly from one or more of the Defendants during the Class Period and paid an energy surcharge imposed by Defendants on those purchases.

**Defendants**

25.     Defendant AGC America, Inc., previously known as Asahi Glass America, Inc., is a Delaware corporation with its principal place of business at 2201 Water Ridge Parkway, Suite 400, Charlotte, North Carolina 28217.  It is a regional headquarters, representative office, and holding company of AGC Group and the parent of AGC Flat Glass North America, Inc.  During the Class Period, AGC America, Inc., directly or through its subsidiaries or affiliates, manufactured and sold Construction Flat Glass in the United States.

26.     Defendant AGC Flat Glass North America, Inc. is a Delaware corporation with its principal place of business at 11175 Cicero Drive, Alpharetta, Georgia 30022-1166.  AGC Flat

Glass North America, Inc., a subsidiary of AGC America, Inc. and Asahi Glass Company, Limited, was previously named AFG Industries Inc.  On September 4, 2007, AFG Industries, Inc. changed its name to AGC Flat Glass North America, Inc.  At that time, Asahi Glass Company, Limited, AFG Industries Inc.'s parent company since 1992, unified the Group brand globally under the name "AGC."  AGC Flat Glass North America, Inc. is the second-largest glass manufacturing company in North America.  During the Class Period, AGC Flat Glass North America, Inc., directly or through its subsidiaries or affiliates, manufactured and sold Construction Flat Glass in the United States.  AGC America, Inc. and AGC Flat Glass North America, Inc. will be collectively referred to herein as "AGC."

27.     Defendant Guardian Industries Corp. ("Guardian") is a Michigan corporation with its principal place of business located at 2300 Harmon Road, Auburn Hills, Michigan 48326. During the Class Period, Guardian manufactured, sold, and distributed Construction Flat Glass in the United States.

28.     Defendant Pilkington North America, Inc. is an Ohio corporation with its principal place of business located at 811 Madison Avenue, Toledo, Ohio 43697.  In June 2006, Pilkington North America, Inc. was acquired by Nippon Sheet Glass, Ltd. ("NSG").  During the Class Period, Pilkington North America, Inc. manufactured, sold, and distributed Construction Flat Glass in the United States.

29.     Defendant Pilkington Holdings Inc. is a Delaware corporation and holds the Pilkington Group's U.S.-based assets.  Its principal place of business is 811 Madison Avenue, Toledo, Ohio 43697.  Pilkington North America, Inc. and Pilkington Holdings Inc. will be collectively referred to herein as "Pilkington."

30.     Defendant PPG Industries, Inc. ("PPG") is a Pennsylvania corporation with its principal place of business at One PPG Place, Pittsburgh, Pennsylvania 15272.  During the Class Period, PPG manufactured, sold, and distributed Construction Flat Glass in the United States.

**Co-Conspirators**

31.     Various other persons, firms, and corporations, not named as Defendants herein, have participated as co-conspirators with the Defendants in the violations of law alleged in this Complaint and have engaged in conduct and made statements in furtherance of the conspiracy. The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered, or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

**<u>JURISDICTION AND VENUE</u>**

32.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, and costs of suit, including reasonable attorneys' fees, as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

33.     Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

34.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each: (a) transacted business in this District; (b) directly or indirectly sold Construction Flat Glass in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities located in or doing business in this District.

35.     Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391 (b) and (c), because during the Class Period Defendants resided, transacted business, were found, or had agents within this District.

36.     Venue is also proper in this District because this action was transferred to this District by the Judicial Panel on Multidistrict Litigation for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407(a).

37.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on the foreign and interstate commerce of the United States.

## CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a proposed class (the "Class") defined as follows:

> All entities that, from at least July 1, 2002 and continuing through at least December 31, 2006, purchased Construction Flat Glass directly from Defendants for delivery or pick-up in the United States.  Excluded from the Class are Defendants, any parent, subsidiary, or affiliate of Defendants, any of Defendants' co-conspirators, and all governmental entities.

39.     The Class is so numerous and geographically dispersed throughout the United States that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least hundreds of members of the Class located nationwide, whose identity can be readily ascertained from Defendants' records.

40.     Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and all members of the Class purchased Construction Flat Glass directly from one or

more Defendants or their co-conspirators, and Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the Class, and the relief sought is common to the Class.

41.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and are represented by counsel experienced and competent in the prosecution of complex antitrust litigation.

42.     Questions of law and fact common to class members predominate over any questions affecting only individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      Whether Defendants conspired or combined for the purpose and with the effect of fixing the price of Construction Flat Glass;

b.      Whether Defendants agreed to implement, impose, and revise an "energy surcharge" on purchases of Construction Flat Glass;

c.      Whether Defendants' conduct violated the federal antitrust laws;

d.      Whether Defendants' conduct caused injury to the business or property of Plaintiffs and the members of the Class; and

e.      The proper measure of class-wide damages.

43.     A class action is superior to any other method for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  The prosecution of separate actions by individual members of the Class, to the extent it would be feasible for individual members to bring such claims, would impose heavy burdens upon the courts and the parties and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class members.  A class action will achieve substantial

economies of time, effort, and expense and will assure uniformity of decision as to entities similarly situated.

44.     The Class has a strong and pervasive community of interest, and no difficulty is anticipated in the management of this action as a class action.

## FACTUAL ALLEGATIONS

### Industry Overview

45.     Construction Flat Glass is flat glass formed through the "float" process for use in the construction or architectural sector, which includes clear and tinted float glass, low emissivity glass (*i.e.*, glass coated with thin metal or metallic oxide layers to improve its insulating qualities), laminated glass, and unprocessed mirror glass.

46.     The float process involves the use of a molten tin bath where molten glass flows freely until it forms a flat ribbon floating on the surface of molten metal.  This flat layer of floating glass is allowed to cool until it is sufficiently rigid to retain its flat shape and is then removed from the surface.   In a Construction Flat Glass plant, the process proceeds uninterrupted: a stream of molten glass is delivered continuously to one end of the molten metal surface, forming an endless, cooling ribbon of glass that is removed from the opposite end of the surface when sufficiently cooled.  The ribbon of glass is then subjected to further processing, inspection, and cutting to desired dimensions.

47.     Commercial float glass manufacture requires relatively large-scale, single purpose plants which are not efficiently convertible to other uses; nor are other manufacturing facilities efficiently convertible to float glass production.  Float glass plants are operated continuously for periods of 8 to 12 years or more before requiring "cold shut-down" for extensive rebuilding and repair.

48.     The largest demand for Construction Flat Glass is for use in windows for dwellings, commercial structures, and architectural products (*e.g.*, curtain-wall panels for office towers and glass doors), which constitutes as much as 70% of all Construction Flat Glass production.

49.     In 2005, the Construction Flat Glass market in the United States exceeded $5.3 billion.

50.     Defendants' customers – Plaintiffs and the proposed Class members – generally purchase Construction Flat Glass from Defendants by the truckload.  Truckloads of Construction Flat Glass are typically delivered by trucking companies hired by Defendants, but some customers occasionally pick up the truckloads themselves from Defendants' plants.

## Operation of the United States Construction Flat Glass Conspiracy

### The Structure of the United States Flat Glass Industry Is Conducive to Collusion

51.     Defendants' price-fixing conspiracy was made possible and facilitated by the structure of the Construction Flat Glass industry, which is conducive to collusion.  Indeed, the Construction Flat Glass industry is in many respects a textbook example of an industry susceptible to efforts to maintain supracompetitive prices.

52.     The United States Construction Flat Glass market is highly concentrated.  Defendants dominate the United States market, accounting for approximately 75% of the market by capacity or sales.  There are a few other firms manufacturing high quality float glass, such as Cardinal Glass Industries, but none of the market shares of any of these other companies rose above approximately 10% during the Class Period.

53.     Construction Flat Glass is an interchangeable, fungible commodity which is principally marketed on price.  Although it may vary in tint or thickness, it is generally a

standardized product.   Many purchasers of Construction Flat Glass purchase from multiple suppliers.

54.    The Construction Flat Glass industry has high barriers to entry, including high fixed costs.  Production of flat glass is capital intensive.  A float plant typically requires an initial investment of $100 million to $250 million, depending on size, location, and product complexity. The economics of the continuous-flow float operation require a high capacity utilization rate before a plant becomes profitable.  Potential entrants to the flat glass industry also face barriers to entry in the form of environmental and other regulations, including those imposed by the Occupational Safety and Health Administration.

55.    Instead of new entry, the Construction Flat Glass industry has experienced a consolidation movement worldwide through various mergers and acquisitions which have contributed to the high level of industry concentration.

56.    There is a history of collusion in the United States flat glass market.  AGC, Guardian, Pilkington, and PPG were previously sued for fixing prices of flat glass products over the period of August 1, 1991 to December 31, 1995.  PPG paid $60 million to settle that action; AGC paid $19.8 million; Pilkington paid $17 million; and Guardian paid $16.9 million.

57.    The Construction Flat Glass industry is characterized by multi-market contact, in that the firms dominating the U.S. market simultaneously are dominant firms in the Construction Flat Glass industry in other countries.  AGC, Pilkington, and Guardian, along with Saint-Gobain (a French company), dominate the European market for Construction Flat Glass through their foreign affiliates.   Defendants' multi-market contacts facilitated and made collusion more feasible in the highly concentrated United States and European markets.

58.     The United States Construction Flat Glass market is mature and stable.  In fact, the United States and European Construction Flat Glass markets are the two most mature Construction Flat Glass markets in the world.  Like most mature markets, they are dominated by sales of commodity products which are marketed and sold principally on the basis of price and are characterized by slim profit margins.  Both characteristics provide a motivation to collude.

### Defendants Exploit Industry Conditions Facilitating Collusion by Agreeing to Fix Prices of Construction Flat Glass

59.     Defendants recognized and exploited the features of their industry that make it susceptible and conducive to collusion.

60.     Defendants' representatives met with each other during the Class Period to discuss pricing levels and practices and agreed to fix prices of Construction Flat Glass sold in the United States.

61.      Defendants agreed to implement identical "energy surcharge" programs and set their energy surcharges at identical amounts and to raise prices of Construction Flat Glass products by identical percentages in a coordinated fashion.

62.     In implementing their conspiracy, Defendants at times engaged in practically simultaneous conduct, unsupported by existing economic and market conditions, demonstrating that their activities were the result of prior knowledge, coordination, and agreement, as opposed to truly independent activity.

### Defendants Introduce Energy Surcharges in Late 2000

63.     Defendants first introduced energy surcharges in late 2000 when natural gas prices abruptly spiked to a level that exceeded Defendants' estimates.  During the end of 2000 and the beginning of 2001, PPG, AGC, Pilkington, and Guardian each announced "energy surcharges" on truckloads of Construction Flat Glass products shipped from the manufacturer.

The surcharges were purportedly intended to recover the unanticipated rise in Defendants' natural gas costs.

64.     Defendants informed their customers that the surcharges would be linked to the New York Mercantile Exchange ("NYMEX") 3-day average natural gas futures price.  NYMEX measures natural gas futures trades in units of 10,000 million British thermal units ("mmBtu") with a reported price based on delivery at the Henry Hub in Louisiana.

65.     Defendants provided charts to their customers showing expected surcharge levels at certain NYMEX averages.  With the NYMEX average around $4.30 mmBtu, Defendants each set their energy surcharges for the 4th quarter ("4Q") of 2000 at $300/truckload.

66.     Although each Defendant initially circulated to its customers a similar chart for energy surcharges, in practice Defendants varied their announced surcharges as circumstances warranted.   Before long, the charts were largely disregarded.   By varying their surcharges, Defendants gave at least the appearance of competition on surcharge prices.

67.     Defendants varied their surcharges by region of the country, depending on the plant from which their products were shipped.  In June 2001, for example, AGC announced its energy surcharge would be $400/truckload, except that all West Coast shipments out of its Victorville, CA plants would be $700/truckload.  PPG set its energy surcharge from its West Coast plants (Fresno, CA and Salem, OR) at $900/truckload and later changed it to $700/truckload.

68.     Such regional variation reflected the fact that Defendants had different energy costs – including natural gas costs – in different regions of the country.

69.      In September 2001, AGC informed customers that its surcharge would be $200/truckload for all products shipped from its Victorville Plant, located on the West Coast, but

it would not impose an energy surcharge on products shipped from other plants.  At the same time, Pilkington was charging a surcharge of $200/truckload from *all* of its plant locations, although in light of the NYMEX average at the time, it would not have been charging any surcharge at all if it followed the chart it originally circulated.

70.     By the end of 2001, with natural gas prices declining, Defendants stopped imposing energy surcharges and did not impose any surcharges during the first two quarters of 2002.

### Defendants Agree to Reintroduce Collusive Energy Surcharges as a Way to Increase Prices Across the Board

71.     By 2002, demand for flat glass was easing in both the United States and Europe, and prices of Defendants' flat glass products were falling.  Defendants had attempted to raise or stabilize prices through conventional price-increase announcements, but those efforts were unsuccessful.  Declining sales and downward pressure on prices provided Defendants the motivation and rationale for the formation of a collusive arrangement designed to arrest and reverse those pressures.

72.     As natural gas prices began to rise again in mid-2002, Defendants saw an opportunity.  Defendants' experience with energy surcharges in 2001 suggested that imposing coordinated energy surcharges could be an effective way to achieve across-the-board price increases, provided Defendants agreed to adopt the same surcharge program and not to depart from the agreed-upon surcharge schedule.

73.     Defendants saw that coordinated energy surcharges could be effective to increase prices because surcharges were set as a flat fee imposed on each truckload of glass.  When imposing energy surcharges, Defendants did not need to go through the logistics of changing prices on multiple products with their customers.  Also, linking surcharges to a schedule made

surcharges easier to increase periodically.   Additionally, surcharges were easier to "sell" to customers because they were presented as pure cost-recovery mechanisms, rather than price increases.

74.     Crucial to the success of Defendants' plan to use energy surcharges as a way to increase their prices across the board was Defendants' agreement to adopt and stick to the same schedule for surcharges and to announce surcharge increases in lockstep at the same time. Defendants agreed to use a chart linked to the NYMEX average for their energy surcharges because this made it easier to implement and monitor their price-fixing agreement.

75.     Defendants' representatives met, in the United States and Europe, and agreed on surcharge and price levels, minimum prices, and the timing of surcharge and price increase announcements.

76.     In the United States, Defendants' discussions about reintroducing surcharges occurred, among other places, under the cover of trade association activities.   As discussed further below, *infra* ¶¶ 126-128, in 2002, Guardian, Pilkington, and PPG were members of a stand-alone trade group for flat glass manufacturers (the Primary Glass Manufacturers Council), which they dominated and controlled.   AGC had been a member until 2001.   Defendants decided that belonging to a stand-alone trade group made it harder to use the trade group to achieve their objectives because their activities received too much attention.   Consequently, in mid-2002, at the same time they were agreeing to reintroduce surcharges, Defendants jointly decided to dissolve their stand-alone trade association and reorganize (along with AGC) as one of several divisions under the umbrella of the Glass Association of North America ("GANA"), which would afford them additional cover for their discussions.

77.    In June 2002, pursuant to their agreement, Defendants announced to their customers that they were reintroducing "energy surcharges."  Each Defendant adopted the same surcharge program, linked to the NYMEX 3-day average natural gas price, with new surcharges announced on a quarterly basis.  Each Defendant adopted the same surcharge schedule, which set surcharges at a higher level than any surcharge schedules Defendants had previously used.

78.    Each Defendant adopted the same complex method of setting prices – including the use of the particular NYMEX average to set surcharges, the particular schedule of surcharge values linked to the NYMEX average, and the announcements of new surcharges on a quarterly basis – which was not a natural response to any common economic factors.

79.    When Defendants collectively reintroduced surcharges in June 2002, they could no longer claim to be caught off-guard by natural gas increases and needed to justify imposition of a higher surcharge schedule.  Defendants thus provided to their customers a new, coordinated justification for the higher surcharges: that, in PPG's words, the higher surcharges were necessary to "share electricity cost inflation in addition to natural gas inflation."  Guardian similarly claimed that its new and higher surcharges were justified in light of costs of "electricity and natural gas."

80.    This justification of electricity cost inflation was pretextual.  PPG told its customers that "electricity has become a much more significant cost factor in producing flat and fabricated glass," but referred only to the fact that electricity had become more expensive in the West.  To the extent this had any validity, and if PPG was operating independently, PPG could have imposed a regional surcharge on shipments from its plants in the West, as it had done previously.  It did not do this, however, because Defendants had agreed to impose the same

surcharges and not to vary them based on region even when different regions had different energy costs.

81.     Defendants recognized they needed to coordinate with each other to impose and maintain their supracompetitive surcharges.  In 2005, a "senior official at one of the primary glass manufacturers [*i.e.*, the Defendants], who preferred not to be identified" was quoted in a trade publication discussing the widespread use of surcharges.  The official noted:  "[A]nyone would have to be careful to deviate from what has become accepted, because then the question of price gouging would come into the picture."

82.     Defendants appeared together at industry conferences to present a unified front on energy surcharges.  For example, during the 2003 Summer Northeast Window & Door Association meeting, Scott Hoover of Pilkington and Larry Tumminia of AGC gave a joint presentation on the *State of the Glass Industry – The Economic Future of Glass*, during which they told glass purchasers, and publicly agreed, that energy surcharges would not end anytime soon and that purchasers should expect an upward trend in prices.

### Defendants Impose Lockstep Surcharges on Their Customers Pursuant to Their Unlawful Agreement

83.     On June 11, 2002, pursuant to Defendants' agreement, PPG announced to its customers that it would impose a surcharge of $200/truckload effective July 1, 2002, for all flat glass products.  The NYMEX average at the time was around $3.20 mmBtu.  (Under PPG's prior chart, this would have amounted to a $100/truckload surcharge.)  PPG sent to its customers the following chart:

| NYMEX Average (Per MMBtu) | Surcharge |
|---|---|
| * | * |
| $5.0 − 5.49 | $600 |
| $4.5 − 4.99 | $500 |
| $4.0 − 4.49 | $400 |
| $3.5 − 3.99 | $300 |
| **$3.0 − 3.49** | **$200** |
| $2.5 − 2.99 | $100 |
| $2.0 − 2.49 | $ 0 |
| $1.5 − 1.99 | -$100 |

\* Above $5.49 – increases of $100 per truckload (as defined in PPG general terms and conditions) for every $0.50 increase in the NYMEX average futures price for natural gas.

84.     On June 14, 2002, Pilkington announced to its customers that it would impose a surcharge of $200/truckload effective July 1, 2002, for all flat glass products.   Pilkington attached to its letter a surcharge chart that was identical to PPG's chart.

85.     On June 17, 2002, Guardian announced to its customers that it would impose a surcharge of $200/truckload effective July 1, 2002, for all flat glass products.   Guardian included with its letter a surcharge chart that was identical to PPG's and Pilkington's chart.

86.     On June 24, 2002, AGC announced to its customers that it would impose a surcharge of $200/truckload effective July 1, 2002, for all flat glass products.   AGC attached to its letter a surcharge chart that was identical to PPG's, Pilkington's, and Guardian's chart.

87.     Thereafter, for a period of over 30 months, Defendants announced the exact same surcharges, quarter after quarter, typically attaching the exact same chart, even as the surcharges steadily increased from $200/truckload to $900/truckload for first quarter ("1Q") 2005.

Defendants often announced their quarterly surcharges over the period of just a few days, giving identical reasons for the increases.

88.     For example, on June 3, 2004, PPG announced an energy surcharge of $700/truckload for 3Q 2004.

89.     On June 5, 2004, AGC announced an energy surcharge of $700/truckload for 3Q 2004.

90.     On June 8, 2004, Guardian announced an energy surcharge of $700/truckload for 3Q 2004.

91.     On June 11, 2004, Pilkington announced an energy surcharge of $700/truckload for 3Q 2004.

92.     Pursuant to their agreement, Defendants varied who would lead the surcharge announcements.  As noted above, PPG announced the 3Q 2004 surcharge first, on the third of the month.   The quarter before, however, AGC had announced the 2Q 2004 surcharge of $700/truckload first, on March 5, with PPG announcing its 2Q 2004 surcharge of $700/truckload on March 11.

93.     Defendants falsely attempted to generate the appearance of price competition by representing to customers that they were pricing independently and were "reviewing" their surcharges on a quarterly basis.  When PPG announced its 3Q 2004 energy surcharge of $700/truckload, for example, it assured its customers that it "will continue to monitor this market and try to create opportunities for reducing our overall energy costs."  Similarly, when AGC announced its 3Q 2004 energy surcharge of $700/truckload, it assured its customers that its surcharge rate would be "reviewed in September."

94.     In 2004 and 2005, Defendants' collusion and charging of supracompetitive prices led to substantial capacity expansion by Cardinal Glass Industries Inc. ("Cardinal").  Cardinal, which did not move its surcharges in lockstep with Defendants, is also a manufacturer of high quality float glass for construction and architectural applications.  In May 2004, Cardinal expanded its capacity in the United States market by opening a $102.5 million float glass manufacturing facility in Durant, Oklahoma, designed to melt 650 tons of glass daily on a continuous basis.  In mid-2005, Cardinal broke ground on another new $130 million plant in Winlock, Washington, also designed to produce 650 tons of glass a day.

**Defendants' Collusive Surcharges Do Not Reflect Actual Energy Costs**

95.     The increasing price of natural gas on the NYMEX futures market in 2002 constituted only a pretextual justification for Defendants to impose energy surcharges that were unrelated to Defendants' actual natural gas costs.

96.     By June 2002, Defendants were aware that natural gas prices on the open market could remain somewhat volatile, and Defendants had taken numerous steps to manage future energy costs, such as engaging in carefully-planned hedging of the prices of future natural gas requirements.  Such practices made Defendants' future natural gas costs substantially more predictable, even as those costs remained somewhat volatile on the open market.

97.     PPG has acknowledged, for example, that in 2003 it used "a number of techniques" to reduce the risks associated with volatile energy prices, including hedging, reducing consumption through improved manufacturing processes, and switching to alternative fuels.  PPG hedged approximately one-third of its anticipated natural gas requirements for 2003 at an average price of $3.25 per mmBtu.  PPG relied heavily on "derivative instruments to manage its exposure to fluctuating natural gas prices through the use of natural gas swap and

option contracts." During every year of the Class Period, PPG hedged a significant portion of its anticipated natural gas requirements. PPG did not even mention in its public reports the use of energy surcharges to offset rising natural gas prices until 2007.

98.     All Defendants employed measures to manage future energy costs. However, none of these cost-saving measures were reflected in adjustment of any Defendant's energy surcharges, as all Defendants moved in complete lockstep, pursuant to their agreement, until the EC's surprise raids in 2005. Because of these cost-management measures, Defendants' energy surcharges did not reflect their true energy costs (much less *unanticipated* increases in natural gas costs).

99.     During the Class Period, in many (if not all) cases, the quarterly surcharge amount Defendants set to correspond to any particular NYMEX value was substantially greater than Defendants' actual natural gas costs.

100.    For example, during an earnings call on April 15, 2004, PPG Senior Vice President William Hernandez stated, "In the fourth quarter [of 2003], we benefited from the fact that about a third of our requirements were hedged at $3.25 which reduced our average cost to about $4.15." According to the surcharge schedule PPG had circulated to its customers, a NYMEX average of $4.15 would amount to an energy surcharge of $400/truckload. However, for 4Q 2003, PPG imposed an energy surcharge of $600/truckload, *i.e.*, the same surcharge announced by the other Defendants, citing NYMEX's average price of $5.099.

101.    In a competitive market, Defendants would have used differences in their independent energy costs to compete on price and seek to gain market share.

**Defendants Agree to Raise Prices and Coordinate Commercial Conditions
Using Conventional Price-Increase Announcements**

102.    During the period in which they were fixing energy surcharges on glass truckloads, Defendants also agreed to announce identical percentage-based price increases for Construction Flat Glass products to their customers.  For the first time in years, due to their collusion, Defendants successfully raised prices using conventional price-increase announcements.

103.    In 2004, for example, on at least two different occasions, Defendants successfully raised their prices by a fixed percentage throughout the United States market.  An AGC executive was quoted in the trade press discussing the price increases AGC (and its competitors) accomplished in 2004:  "We really did not have price erosion of those two increases.  The prices stuck and we still have them today."

104.    The timing of Defendants' price increases during the Class Period is itself evidence of their collusive nature.  The price increases were not the type of truly sequential price increases that occur in a competitive market, as the time-frame over which the identical price increases occurred was insufficient to permit each Defendant independently to learn of the price increase announced by another Defendant and then make the independent business judgments about whether or not to announce an increase and, if so, at what level.

105.    For example, on August 30, 2004, PPG sent to its customers a letter announcing a price increase of 5% on its Construction Flat Glass products.  On September 1, 2004, Guardian sent to its customers a letter announcing an identical price increase of 5% for all Construction Flat Glass products.  On September 2, 2004, AGC sent to its customers a letter announcing a price increase of 5% for all Construction Flat Glass products.

106.   As the timing of these announcements indicates, Defendants communicated their pricing intentions to each other prior to sending the announcements to customers.  Defendants also monitored implementation of their agreed-upon price increases to ensure their effectiveness.

107.   Defendants' September 2004 price increase coincided with cartel meetings in Europe in 2004, and the coordinated imposition by the European cartel in September 2004 of energy surcharges.  Pursuant to their agreement, European affiliates of Guardian, Pilkington, AGC, and Saint-Gobain, announced implementation of energy surcharges in Europe on September 1, 2004.

108.   Defendants' September 2004 price increase in the United States also occurred just before the GANA Fall conference in Nashville, Tennessee.  Defendants are all members of GANA's Flat Glass Manufacturing division, which they joined as founding members in January 2003.  Defendants regularly met under the cover of GANA's Flat Glass Manufacturing division, including in advance of GANA conferences.

109.   Defendants made coordinated statements to the market about market conditions in order to minimize suspicion about their price increases.  For example, in a January 2005 article in the trade press, executives from Pilkington and AGC publicly agreed with each other that capacity in the glass market in 2005 would be "tighter" than in 2004 (a year in which Defendants were successful in raising prices on at least two occasions).  Such statements were false, as capacity was not tight in the Construction Flat Glass market in either 2004 or 2005.  The same article noted that "a number of people in the industry have expressed the belief that the primary manufacturers [*i.e.*, Defendants] are using the specter of a glass shortage to raise the price of commodity glass."

110.   The increases in Defendants' Construction Flat Glass prices during the Class Period cannot be reconciled with prevailing economic conditions (*i.e.*, demand and cost factors) during the Class Period.

111.   The near-simultaneous price increases imposed by Defendants during the Class Period were based on prior coordination and agreement rather than the result of independent behavior, and as a result, prices were inflated above what would have prevailed under competitive conditions.

### Defendants' Prices in the United States Diverge for the First Time in Over Thirty Months Because of the EC Investigation

112.   Following the surprise EC raids (discussed further below) in February 2005 at the European offices of Guardian, Pilkington, AGC Flat Glass Europe (formerly known as Glaverbel), and Saint-Gobain, Defendants varied their surcharges in the United States *for the first time* since their reintroduction in 2002 in order to give at least the appearance of price competition.

113.   With the onset of the EC investigation, Defendants' coordination of pricing in the United States changed dramatically.  Since Defendants' reintroduction of energy surcharges in June 2002, Defendants had invariably announced the exact same surcharges.  In April 2005, following the EC raids, PPG announced to its customers that it was increasing its surcharge by $100/truckload, but not all Defendants announced a similar increase.  In September 2005, Guardian announced a surcharge for 4Q 2005 that was $275 *lower* than PPG, Pilkington, and AGC's.  For 1Q 2006, Guardian's announced surcharge was $375 lower than PPG, Pilkington, and AGC's.  Prior to the EC investigation, Guardian had announced the exact same surcharges as the other Defendants, month after month, quarter after quarter, since June 2002.

114.    Similarly, in June 2006, AGC announced a surcharge that differed from PPG and Pilkington's *for the first time* since Defendants reintroduced surcharges in June of 2002.  PPG and Pilkington announced surcharges that were $25/truckload lower than AGC's.  At the same time, Guardian's surcharge was $350/truckload lower than PPG's and Pilkington's, and $375/truckload lower than AGC's.

### European Commission Proceedings

115.    The EC launched its investigation into the Construction Flat Glass industry in February 2005 after obtaining "reason to believe that the manufacturers concerned may have (amongst other things) coordinated price-increases and agreed upon the introduction of a so called 'energy surcharge' in the area of flat glass."

116.    On February 22 and 23, 2005, the Commission carried out surprise raids on the premises of Guardian, Pilkington, AGC Flat Glass Europe ("AGC Europe," formerly known as Glaverbel), and Saint-Gobain.  On March 2, 2005, the Commission carried out a second round of raids at the premises of Guardian and GEPVP, the European trade association.

117.    In between the two rounds of raids, AGC Europe (and its parent company, Asahi) applied to the Commission for immunity from fines or, in the alternative, reduction of fines. Under the Commission's Leniency Policy, participants in cartels may be eligible for immunity from or reductions in fines if they provide cooperation and evidence helping to substantiate the cartel.  Asahi cooperated with the Commission and provided affirmative evidence of the operation of the flat-glass price-fixing cartel and, in response, was ultimately granted a reduction in fines.

118.    The Commission's investigation revealed definitive evidence of a Construction Flat Glass price-fixing cartel operating in the European Economic Area from January 2004 to February 2005.   The Commission found that the European affiliates of AGC, Guardian,

Pilkington, and Saint-Gobain agreed to fix prices and exchange sensitive commercial information and agreed on the timing of their price increase announcements, minimum prices, and other commercial conditions for flat glass.

119.    As stated by the Commission:

> Between early 2004 and early 2005, Asahi, Guardian, Pilkington and Saint-Gobain managed to raise or otherwise stabilise prices through a series of meetings and other illicit contacts.
>
> ***
>
> The evidence uncovered describes in detail several meetings in restaurants and hotels in different European countries during which Asahi, Guardian, Pilkington and Saint-Gobain discussed and agreed the level and timing of price increases (including which undertaking was to lead the price increase), target prices, minimum prices and/or exchanged sensitive commercial information.

120.    The Commission found evidence of face-to-face cartel meetings among company representatives at restaurants and hotels on January 9, 2004, April 20, 2004, December 2, 2004, and February 11, 2005.

121.    The Commission found both the European divisions and their parent companies liable for the price-fixing cartel, and imposed fines totaling €486.9 million on the members of the cartel, with Guardian – the United States-based participant – receiving the largest fine of €148 million.  Pilkington was fined €140 million, Saint-Gobain was fined €133.9 million, and Asahi – the leniency applicant – was fined €65 million.  Collectively, this was the fifth largest fine in the history of the European Union.

122.    None of the companies appealed the fine.  On January 31, 2008, Nippon Sheet Glass Co., Ltd. confirmed that its subsidiary, Pilkington Group Limited, would not appeal and

would pay the €140 million fine.  On February 5, 2008, Asahi and AGC Europe announced that Asahi would pay the €65 million fine.

123.    In 2004, before the EC raids, Pilkington publicly acknowledged that its 2002 reintroduction of energy surcharges in the United States was connected to the "similar" introduction of surcharges in 2004 in Europe.  Pilkington's Interim Year Report for 2004 states: "Following the sharp increase in the cost of gas in North America, in 2002 Pilkington introduced a surcharge on glass delivered to Building Products' customers in North America.  The recent surge in energy costs in other territories has led to the introduction of a similar energy surcharge on deliveries of glass to Building Products' customers in Europe, beginning in November 2004."

124.    Thus, at the same time Defendants were engaging in an unlawful conspiracy to increase prices of Construction Flat Glass sold to United States purchasers, by collusively imposing energy surcharges and issuing price-increase announcements, several of the same entities (through foreign affiliates) were engaging in similar anticompetitive conduct in Europe.

### Defendants' Use of Trade Association and Industry Meetings

125.    In the United States and Europe, Defendants' meetings were facilitated by, and occurred under cover of, membership in trade associations.

126.    Prior to 2002, Defendants were members of a stand-alone trade group in the United States called the Primary Glass Manufacturers Council ("PGMC").  AGC withdrew from PGMC around 2001.  Following AGC's departure, PGMC consisted of Guardian, Pilkington, and PPG.  Defendants wished to use the trade group to provide cover for their conspiratorial meetings, but were concerned that being involved in a stand-alone trade group brought too much scrutiny to their activities.

127.    Accordingly, in mid-2002, just as Defendants were agreeing to impose their collusive energy surcharges, Defendants discussed disbanding and ultimately agreed to disband PGMC and to reform as a division within GANA.  GANA is a trade association organized into several divisions representing different elements of the glass industry.  Defendants believed that operating as a division within a larger organization such as GANA would provide them additional cover for their discussions.

128.    At a December 3, 2002 PGMC meeting, representatives of Guardian, Pilkington, and PPG agreed to dissolve the organization effective December 31, 2002.  Directly thereafter, in January 2003, Defendants reformed their trade group under the umbrella of GANA, as GANA's Flat Glass Manufacturing Division.  The new division's founding full members were AGC, Guardian, Pilkington, PPG, and Visteon.  AGC, Guardian, PPG, and Pilkington met regularly during the Class Period under the auspices of the association and discussed energy surcharges and prices for Construction Flat Glass.

129.    GANA's stated mission is to "provide a forum for exchanging information and ideas, for reaching consensus and presenting a unified voice on matters affecting the glass industry."  GANA proclaims that it provides a forum to "put members in regular contact with their peers" and that it strives to provide its members "networking opportunities."

130.    Some of Defendants' representatives on GANA's Flat Glass Manufacturing Division during operation of the United States and European cartels had global business responsibilities.  Guardian's director of international business, Stephen P. Farrar, who was responsible for Guardian's global business development efforts, was Guardian's representative on and a co-chairperson, along with Stephen Weidner, Pilkington's director of sales and marketing, of GANA's Flat Glass Manufacturing Division in 2004 and 2005.

131.    As noted above, certain price increases occurred in close conjunction with Defendants' GANA meetings.  For example, in September 2004, Defendants announced price increases of 5% on their flat glass products just before GANA's Fall Conference.

132.    In 2004, an affiliate of Saint-Gobain joined GANA's Flat Glass Manufacturing Division, despite the fact that Saint-Gobain – although having a large flat-glass manufacturing presence in Europe – had an insubstantial presence in the United States.  With the addition of Saint-Gobain in 2004, GANA's Flat Glass Manufacturing Division contained the four companies whose foreign counterparts were operating a Construction Flat Glass cartel in Europe in 2004 and 2005.

133.    The European Commission, which found that the Construction Flat Glass cartel in Europe was organized through meetings in restaurants and hotels in 2004 and 2005, focused its investigation on a European trade association of flat glass manufacturers known as the European Association of Flat Glass producers, or by its French name Groupement Europeen des Producteurs de Verre Plat ("GEPVP").

134.    In September of 2007, GEPVP changed its name to "Glass For Europe."  The four member companies of GEPVP were:  AGC, Guardian, Pilkington, and Saint-Gobain – *i.e.*, precisely the four companies found by the European Commission to be members of the European flat glass cartel in 2004 and 2005.  (It appears Guardian recently left Glass for Europe.)

## Relationship Between United States and European Markets

### Similarities Between United States and European Markets

135.    The United States and European Construction Flat Glass markets are similar and share numerous important common features.  Given this similarity, the recognition by the dominant players in the European market (including foreign affiliates of Defendants here) that

collusion was necessary during 2004 and 2005 to impose energy surcharges and price increases in Europe is itself evidence that similar measures to impose surcharges and increase prices were achieved in the United States through collusion.

136.   One significant similarity between the United States and European flat glass markets is that both markets are mature.  Glass markets outside of the United States and Europe are considerably less mature.  This market maturity provided a significant incentive to collude.

137.   Both the United States and European markets are dominated by a small number of overlapping firms, selling a fungible commodity product, with basically identical supply chains; both markets also impose similar entry barriers and fixed costs.

### Defendants' Multi-Market Contacts

138.   Simultaneous interaction by firms in multiple markets makes collusion easier to sustain.  Multi-market contact can mute market level asymmetries.  For example, although a firm with a competitive advantage in one market may be tempted to defect from a price-fixing agreement, it will be deterred from doing so if it knows that another firm would respond in a different market in which it has a competitive advantage.  Additionally, multi-market contact increases the frequency of interaction, permitting one firm to discipline another more rapidly than would otherwise be possible.

139.   AGC, Pilkington, and Guardian (through affiliates) are significant players in both the United States and European markets.  This multi-market contact made it both desirable and feasible for Defendants to sustain collusion in both markets.  Defendants' maintenance of collusion in the United States, for example, could have been compromised if Defendants were not simultaneously colluding in Europe, and vice versa, as each Defendant's collusive profits in

one market could have been undercut if a counterpart was aggressively competing in the other market.

140.    Defendants' maintenance of collusion was not undercut by defection from the price-fixing arrangement in either the United States or Europe.  Defendants' collusion – in both the United States and Europe – was only compromised when it was uncovered by the EC.

### Defendants' Global Management of Operations

141.    Defendants operating in both the United States and Europe manage their glass operations, and monitor prices of Construction Flat Glass, on a global scale.

142.    Guardian is managed globally out of its United States headquarters.  As noted, Guardian's director of international business served as a chairperson of GANA's Flat Glass Manufacturing Division while the cartels were operating in the United States and Europe in 2004 and 2005.

143.    During this period, Asahi's flat glass company was also managed on a global basis, with the CEO of the North American division reporting directly to the CEO of the flat glass company, who in turn reported to the president and CEO of Asahi.  Asahi states that it uses an "integrated strategy of a global organization" and that it is committed to taking "full advantage of globally integrated glass operations."

144.    Luc Willame was named head of the worldwide flat glass operations of Asahi Glass in mid-2002.  He was replaced in December 2004 by Arthur Ulens, who had been serving as regional president of Europe for the flat glass company.  While serving as President of Asahi's flat glass company, Ulens stressed the global nature of the flat glass market.  In a speech at Glass Processing Days in 2005, for example, he emphasized that flat glass companies must "develop a global strategy."

145.     In January 2008, following the EC findings, Asahi announced that Ulens would leave the company.  Aside from heading Asahi's worldwide operations, Ulens also served as chairman of the glass manufacturing trade association GEPVP, the European counterpart to GANA's flat glass manufacturing division and a focal point of the EC investigation, during the period of the European cartel.

146.     Both prior to and after being sold to NSG, Pilkington has been managed globally out of its London headquarters.  During the Class Period, the worldwide Building Products division of Pilkington was managed by the president of the worldwide Building Products business line, with regional Building Products managing directors for Europe, North America, Japan, South America, and South East Asia reporting to the president of the worldwide Building Products business line.

147.     On May 14, 2002, around the start of Defendants' United States price-fixing conspiracy, Pilkington announced that Stuart Chambers, then president of the worldwide Building Products business line, would be appointed CEO of the entire company's operations.  Chambers served as CEO of Pilkington until the company was purchased by NSG Group in 2007.

148.     This global management means that participants in the European cartel, including those who met in person, had management and pricing responsibilities for both the United States and Europe.

## Defendants' Price-Fixing Was Effective

149.     As a result of Defendants' coordinated imposition of price increases and energy surcharges, prices of Construction Flat Glass in the United States were elevated above competitive levels during the Class Period.

150.    Defendants' collusion allowed them to reap record profits even as their input costs increased.   Indeed, Defendants were able to collect *more* than the increase in their input costs through their supracompetitive pricing.   PPG acknowledged, for example, that it "had success in passing along increases in raw materials and energy.   As an example, we pioneered a natural gas energy surcharge in the performance glazings, or architectural glass, industry, which has enabled us to recapture a portion of our higher energy costs.   As a matter of fact, we have *more than offset* the combined $600 million of higher input costs with our own pricing increases."

151.    As a result of their supracompetitive prices for Construction Flat Glass, Defendants reaped unprecedented profits during the Class Period.   PPG, for example, announced that it "delivered a *record* fourth-quarter performance" in 2004, despite charges associated with an asbestos settlement.   In April 2005, PPG announced that it had "generated record sales" over all of 2004, and that "pricing is up" again in 2005.

152.    In February 2005, Asahi Glass Company, Limited, the parent corporation of AGC, reported record pre-tax profits for the year 2004.

153.    Similarly, Pilkington announced in November 2004 that it had achieved "robust profits, despite rising costs."   Pilkington's chief executive noted:   "Against a background where 80 percent of our business is in markets where prices are flat or in decline and volumes are flat, I'm very pleased with our result."

## TOLLING OF STATUTE OF LIMITATIONS

154.    Defendants actively misled their customers about the fact that they had agreed to fix prices of Construction Flat Glass in the United States.   While Defendants were fixing prices, Defendants falsely represented to their customers that they were pricing independently and were, for example, reviewing their surcharges and surcharge schedules in light of actual energy costs

and market conditions.  Defendants gave numerous pretextual justifications for their surcharges and price increases, which were designed to conceal the fact that Defendants had agreed upon prices.

155.     Given Defendants' affirmative conduct to conceal their price-fixing agreement, and the self-concealing nature of price-fixing conspiracies, no reasonable person would have had grounds to know about or investigate Defendants' price-fixing conspiracy until, at the earliest, the date of the EC's surprise raids in Europe.

156.     Before and after the disclosure of the EC surprise raids, Plaintiffs were reasonably and duly diligent in protecting their business interests.  However, Plaintiffs failed to discover the facts giving rise to their claim until sometime within the past four years.  Following the commencement of the EC investigation, Plaintiffs through counsel investigated Defendants' conduct in the United States.

## ANTITRUST INJURY TO PLAINTIFFS AND CLASS

157.     Defendants' unlawful conduct, combination, or conspiracy, as alleged herein, had and is having the following effects, among others:

a.      Prices paid by Plaintiffs and the Class for Construction Flat Glass were fixed or stabilized at supracompetitive levels;

b.      "Energy surcharges" paid by Plaintiffs and the Class as part of the purchase of Construction Flat Glass were fixed or stabilized at supracompetitive levels;

c.      Plaintiffs and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Construction Flat Glass; and

     d.     Competition in establishing the prices paid in the United States for Construction Flat Glass has been unlawfully restrained, suppressed and eliminated.

158.    By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiffs and the members of the Class have sustained injury to their business or property. The injury sustained by the Plaintiffs and the Class is the payment of supracompetitive prices for Construction Flat Glass as a result of Defendants' illegal combination and conspiracy to restrain trade as alleged. This is an antitrust injury of the type that the federal antitrust laws were meant to punish and prevent.

## VIOLATIONS ALLEGED

### First Claim for Relief

**Violation of Section 1 of Sherman Act and Section 4 of Clayton Act**

159.    Plaintiffs incorporate and re-allege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

160.    Beginning at least as early as July 1, 2002, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Construction Flat Glass sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

161.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following:

      a.      Fix, raise, maintain, and stabilize the price of Construction Flat Glass;

      b.      Implement, impose, and revise an "energy surcharge" to increase the price of Construction Flat Glass; and

      c.      Restrain competition for sales of Construction Flat Glass in the United States.

162.    Defendants' combination and conspiracy as alleged herein has had the following effects, among others:

      a.      Price competition in the sale of Construction Flat Glass has been restrained, suppressed, and/or eliminated in the United States;

      b.      Prices for Construction Flat Glass sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, supracompetitive levels throughout the United States; and

      c.      Plaintiffs and other Class members who purchased Construction Flat Glass directly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

163.    Plaintiffs have been injured and will continue to be injured in their business and property by paying more for Construction Flat Glass purchased directly from Defendants and their co-conspirators than they would have paid (and will pay) in the absence of the combination and conspiracy.

164.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered injury in that they have paid supracompetitive prices and surcharges for Construction Flat Glass during the Class Period.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request:

    (1)    That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be denominated as class representatives, and that Plaintiffs' counsel be appointed as counsel for the Class;

    (2)    That the unlawful combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

    (3)    That Plaintiffs and the Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs and each and every member of the Class;

    (4)    That each of the Defendants' respective officers, directors, agents, and employees, and all other persons acting on behalf of or in concert with them, be permanently enjoined and restrained from, directly, continuing, or maintaining the combination, conspiracy, or agreement alleged in this case;

    (5)    That Plaintiffs and the Class recover treble damages, as provided by law;

    (6)    That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

    (7)    For such further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury for all issues so triable.

| | |
|---|---|
| Dated: September 5, 2008 | **SPECTER SPECTER EVANS & MANOGUE, P.C.**<br><br><br>By:  s/John C. Evans                          .<br>    John C. Evans (PA ID No. 49351)<br>    David J. Manogue (PA ID No. 42119) |

The 26th Floor Koppers Building
Pittsburgh, PA  15219
Telephone:  (412) 642-2300
Facsimile:  (412) 642-2309
Email:  jce@ssem.com; dmanogue@ssem.com

   *Liaison Class Counsel*

Robert G. Eisler
Steig D. Olson
**COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.**
150 East 52nd Street, Thirtieth Floor
New York, NY 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
Email: reisler@cmht.com; solson@cmht.com

Michael D. Hausfeld
George F. Farah
**COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email:  mhausfeld@cmht.com;
gfarah@cmht.com

Steven A. Kanner
Douglas A. Millen
Michael E. Moskovitz
Robert J. Wozniak
**FREED KANNER LONDON
& MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone.:  (224) 632-4500
Facsimile:  (224) 632-4521
Email:  skanner@fklmlaw.com;
dmillen@fklmlaw.com;
mmoskovitz@fklmlaw.com;
rwozniak@fklmlaw.com

Bernard Persky
Hollis L. Salzman
Kellie Lerner
Benjamin D. Bianco
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477
Email:  bpersky@labaton.com;
hsalzman@labaton.com;
klerner@labaton.com; bbianco@labaton.com

W. Joseph Bruckner
Richard A. Lockridge
Heidi M. Silton
Anna M. Horning Nygren
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Telephone: 612-339-6900
Facsimile: 612-339-0981
Email: wjbruckner@locklaw.com;
ralockridge@locklaw.com;
hmsilton@locklaw.com;
amhorningnygren@locklaw.com

*Interim Co-Lead Class Counsel*